Slip Op. 20-110

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HYUNDAI ELECTRIC & ENERGY SYSTEMS CO., LTD., | |
| Plaintiff, | |
| v. | Before: Mark A. Barnett, Judge |
| UNITED STATES, | Court No. 19-00058 |
| Defendant, | **Public Version** |
| and | |
| ABB INC., | |
| Defendant-Intervenor. | |

<u>**OPINION**</u>

[Sustaining the U.S. Department of Commerce's final results in the fifth administrative review of large power transformers from the Republic of Korea.]

Dated: August 4, 2020

<u>David E. Bond</u> and <u>Ron Kendler</u>, White & Case LLP, of Washington, DC, argued for Plaintiff Hyundai Electric & Energy Systems Co., Ltd.  With them on the brief was <u>William J. Moran</u>.

<u>Kelly A. Krystyniak</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director.  Of counsel on the brief was <u>David W. Richardson</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Melissa M. Brewer</u> and <u>R. Alan Luberda</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenor ABB Inc.  With them on the brief was <u>David C. Smith</u>.

Barnett, Judge:  This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") final results in the fifth administrative review of the antidumping duty order on large power transformers ("LPTs") from the Republic of Korea for the period of review ("POR") August 1, 2016, to July 31, 2017.[1]  *Large Power Transformers From the Republic of Korea*, 84 Fed. Reg. 16,461 (Dep't Commerce Apr. 19, 2019) (final results of antidumping duty admin. review; 2016–2017) ("*Final Results*"), ECF No. 18-4, and accompanying Issues and Decision Mem., A-580-867 (Apr. 12, 2019) ("I&D Mem."), ECF No. 18-5.

Plaintiff Hyundai Electric & Energy Systems Co., Ltd. ("Hyundai") challenges the agency's decisions to: (1) cancel verification; (2) apply total facts otherwise available and (3) use an adverse inference (or "total AFA").  *See* Confidential Rule 56.2 Mot. for J. on the Agency R. on Behalf of Pl. [Hyundai], ECF No. 34, and Confidential Am. Mem. of P&A in Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Hyundai's Mem."), ECF No. 34-1; *see also* Confidential Reply in Supp. of Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Hyundai's Reply"), ECF No. 47.

Defendant United States ("the Government") and Defendant-Intervenor ABB Inc. ("ABB") each filed a response in support of the agency's *Final Results*.  *See* Confidential Def.'s Resp. to Pl.'s Mot. For J. on the Agency R. ("Gov't's Resp."), ECF

---

[1] The administrative record for this case is divided into a Public Administrative Record ("PR"), ECF No. 18-2, and a Confidential Administrative Record ("CR"), ECF No. 18-3. Parties further submitted joint appendices containing record documents cited in their briefs.  *See* Public J.A. ("PJA"), ECF No. 50-1; Confidential J.A. ("CJA"), ECF No. 49-1. Citations are to the confidential joint appendix unless stated otherwise.

No. 40; Confidential Def.-Int.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R.

("ABB's Resp."), ECF No. 42.

   For the reasons discussed below, the court denies Hyundai's motion and

sustains Commerce's *Final Results*.

## JURISDICTION AND STANDARD OF REVIEW

   The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[2] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence

and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## BACKGROUND

   On October 16, 2017, Commerce initiated this fifth administrative review.

*Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 82 Fed. Reg.

48,051, 48,053 (Dep't Commerce Oct. 16, 2017), PR 8, CJA Tab 1.  Commerce

selected Hyundai Heavy Industries, Co., Ltd.[3] and Hyosung Corporation as mandatory

respondents.  Prelim. Decision Mem. at 1.  Commerce issued an initial questionnaire

and two supplemental questionnaires seeking, in relevant part, information regarding

Hyundai's costs of producing and selling LPTs.  *See* Request for Information (Dec. 13,

2017) ("Initial Questionnaire"), PR 24, CJA Tab 2; 1st Sec. D Suppl. Questionnaire (May

24, 2018) ("1st Suppl. Questionnaire"), CR 391, PR 175, CJA Tab 4; 2nd Sec. D Suppl.

---

[2] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition.
[3] Hyundai is the successor in interest to Hyundai Heavy Industries, Co., Ltd.  *See* Decision Mem. for Prelim.  Results of Antidumping Duty Admin. Review (Aug. 31, 2018) ("Prelim. Decision Mem.") at 1 & n.1, PR 313, CJA Tab 12.

Questionnaire (July 12, 2018) ("2nd Suppl. Questionnaire"), CR 690, PR 249, CJA Tab 9.

On September 7, 2018, Commerce published its *Preliminary Results*. *Large Power Transformers From the Republic of Korea*, 83 Fed. Reg. 45,415 (Dep't Commerce Sept. 7, 2018) (prelim. results of antidumping duty admin. review; 2016–2017) ("*Prelim. Results*"), PR 314, CJA Tab 13. Therein, Commerce preliminarily determined to assign Hyundai a weighted-average dumping margin of 60.81 percent based on total AFA. *Id.* at 45,416; Prelim. Decision Mem. at 15. When Commerce published the *Preliminary Results*, the agency also informed Hyundai that it would not conduct the previously scheduled verification of Hyundai's data. *See* Ltr. From Commerce to David E. Bond (Oct. 26, 2018) ("Commerce Ltr."), PR 366, CJA Tab 15 (stating that Commerce had cancelled verification pursuant to the *Preliminary Results*).

Hyundai and ABB submitted case briefs concerning Commerce's *Preliminary Results*, *see* I&D Mem. at 3 & n.3 (citations omitted), and Hyundai separately requested that Commerce reconsider its decision to cancel verification, *see* Commerce Ltr. Commerce declined Hyundai's request, stating that the information Hyundai provided, "which [the agency] would rely on for purposes of verification[, was], in fact, not verifiable," and that "verification is not intended to be an opportunity for a respondent to submit new factual information." *Id*.

On April 19, 2019, Commerce published its *Final Results*. As discussed *infra*, Commerce found that Hyundai failed to provide reliable and verifiable cost information with respect to its cost-reconciliation information and its product-specific cost

information.  *See* I&D Mem. at 9–13, 14–16.  Commerce explained that Hyundai's cost

information was so incomplete as to be unverifiable.[4]  *Id.* at 13; *see also id.* at 18 ("A

prerequisite for verification is untainted information on the record with complete

responses to all of Commerce's requests for information.").  Because Hyundai's

reported cost information was not reliable Commerce continued to apply total facts

otherwise available.  *See id.* at 4.

Commerce made the additional finding that an adverse inference was warranted

because: (1) Hyundai did not provide information "which any company should be

expected to be able to provide"; and (2) Commerce afforded Hyundai numerous

opportunities to provide the "requested explanations and details associated with the

deviations from its normal SAP[5] cost accounting system."  *Id.* at 23.  Thus, the agency

continued to rely on total AFA and assigned a weighted-average dumping margin of

60.81 percent to Hyundai.  *Final Results*, 84 Fed. Reg. at 16,462; *see also* I&D Mem. at

4.

## DISCUSSION

### I.   **Legal Framework**

When necessary information is not available on the record, or an interested party

withholds information requested by Commerce, fails to provide requested information by

the submission deadlines, significantly impedes a proceeding, or provides information

that cannot be verified pursuant to 19 U.S.C. § 1677m(i), Commerce "shall . . . use the

---

[4] Commerce also explained that its decision to cancel verification was distinct from its rationale for applying an adverse inference.  I&D Mem. at 13.

[5] Hyundai uses SAP as its cost accounting system in the normal course of business. I&D Mem. at 8.

facts otherwise available."  19 U.S.C. § 1677e(a).  Commerce's authority to use the

facts otherwise available is subject to 19 U.S.C. § 1677m(d) and (e).  *Id*.  Pursuant to

section 1677m(d), if Commerce determines that a respondent has not complied with a

request for information, it must promptly inform that respondent of the nature of the

deficiency and, to the extent practicable in light of statutory deadlines, provide "an

opportunity to remedy or explain the deficiency."

Pursuant to 19 U.S.C. § 1677m(e), Commerce "shall not decline to consider

information that is submitted by an interested party" and that satisfies all of the following

requirements:

> (1) the information is submitted by the deadline established for its
> submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot serve as a reliable
> basis for reaching the applicable determination,
> (4) the interested party has demonstrated that it acted to the best of its
> ability in providing the information and meeting the requirements
> established by the administering authority or the Commission with respect
> to the information, and
> (5) the information can be used without undue difficulties.

Commerce does not violate 19 U.S.C. § 1677m(e) when it rejects information that does

not meet all five requirements.  *See Papierfabrik Aug. Koehler SE v. United States*, 843

F.3d 1373, 1382–83 (Fed. Cir. 2016).

If Commerce determines that a party "has failed to cooperate by not acting to the

best of its ability to comply with a request for information," Commerce "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available."  19 U.S.C. § 1677e(b).  "Compliance with the 'best of its ability'

standard is determined by assessing whether a respondent has put forth its maximum

effort to provide Commerce with full and complete answers to all inquiries in an

investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir.

2003).  Commerce may disregard a respondent's information and use total adverse

facts available when one of the major categories of information necessary to perform a

dumping calculation (U.S. sales, home market sales, cost of production, or constructed

value) has not been provided.  *Steel Auth. of India, Ltd. v. United States*, 25 CIT 482,

487, 149 F. Supp. 2d 921, 927–28 (2001).

## II. Commerce's Determination to Rely on Facts Available and Cancel Verification

In assessing the reliability of a respondent's cost of production, Commerce

"examines and confirms not only that a respondent has [accurately and completely]

reported the total pool of costs [that] the respondent reports as being attributable to the

merchandise under consideration . . . , but also that the costs are reasonably and

accurately allocated to *individual control numbers*."  I&D Mem. at 20 & n.85 (emphasis

added) (quoting *Sidenor Indus. SL v. United States*, 33 CIT 1660, 1666, 664 F. Supp.

2d 1349, 1356 (2009)).  In this case, Commerce determined that Hyundai's normal

books and records were not reliable for purposes of reporting Hyundai's cost of

production because Hyundai shifted costs between LPT projects[6] in its internal

---

[6] As indicated in Hyundai's responses, a single LPT project may include multiple LPT units.  *See, e.g.*, First Suppl. Sec. D Questionnaire Resp. (June 11, 2018) ("1SDQR"), Attach. SD-3 at ECF pp. 213–15, CR 397–430, PR 196–201, CJA Tab 7 (identifying the CONNUM(s)—defined *infra* note 9—included in certain projects); Second Suppl. Sec. D Questionnaire Resp. (July 23, 2018) ("2SDQR"), Attach. 2SD-1 at ECF p. 420–21, CR 792–819, PR 284–92, CJA Tab 10 (indicating the quantity of LPT units included in sampled projects).

accounting system (i.e., SAP).  *See* I&D Mem. at 8–9.  Thus, Commerce sought

information underlying Hyundai's normal books and records.  *See id.* at 9 ("Hyundai is

compelled to provide source information on expenses from its SAP© accounting system

(*i.e.*, [its normal books and records]).").  Relevant to this discussion, Commerce

requested information regarding Hyundai's cost-reconciliation[7] and product-specific[8]

costs but Hyundai failed to adequately respond to those information requests.  *See id*.

at 9–11 (describing Commerce's questions regarding product-specific costs), 15

(describing Commerce's questions regarding cost-reconciliation information).

Commerce explained that it required this information to assess whether: (1) Hyundai's

"overall production costs at the aggregate level reconcile to [Hyundai's] records"; and

(2) the cost of manufacturing components as reported "also reconcile to its normal

records at both the CONNUM-specific and product-specific levels."[9]  *Id*. at 21.  Absent

---

[7] Cost-reconciliation information refers to cost of production information that Commerce requires a party to provide to reconcile the reported costs to the company's audited financial statements.  I&D Mem. at 8; *see also* Prelim. Decision Mem. at 17 ("As a part of this analysis, Commerce requires that [a respondent] demonstrat[e] that overall production costs at the aggregate level reconcile to a respondent's records . . . .").

[8] Product-specific cost information relates to the costs that Hyundai incurred in manufacturing each specific LPT unit.  Although Commerce sought product-specific costs, Hyundai reported product-specific cost information on a project-specific basis. *See* Sec. D. Questionnaire Resp. (Jan. 31, 2018) ("DQR") at 27, CR 88–102, PR 71–72, CJA Tab 3.  Thus, Commerce referenced both project-specific and product-specific costs.  *See, e.g.*, I&D Mem. at 9 (referring to "the reliability of the reported product-specific costs"), 19 (referring to "the project-specific cost[s]").  To avoid confusion, the court refers to this information as "product-specific" cost information.

[9] CONNUM refers to "control number," which is a number designed to reflect the "hierarchy of certain characteristics used to sort subject merchandise into groups" and allow Commerce to match identical and similar products across markets.  *Bohler Bleche GmbH & Co. KG v. United States*, 42 CIT ___, ___, 324 F. Supp. 3d 1344, 1347 (2018).

reliable and fully supported cost data, Commerce "cannot rely on the reported per-unit [cost of production]," *id*, or "perform the dumping calculations," *id*. at 23.

Because Hyundai failed to adequately respond to Commerce's requests for cost information, Commerce relied on total facts otherwise available and cancelled the scheduled cost verification.  *See id*. (stating that Hyundai's reported costs are not "actual, verifiable, and reliable").  Whether substantial evidence supports those determinations depends on whether Hyundai provided reliable cost information in response to Commerce's information requests; thus, the court will discuss these issues together.[10]

### A.  Product-Specific Cost Information

### 1.  Additional Background

Commerce asked Hyundai to explain "how [it] used [its] normal cost and financial accounting records" to allocate and report costs for each LPT project.  Initial Questionnaire at D-11 to D-12.  Hyundai's initial questionnaire response explained that, in its normal books and records, Hyundai [[

---

[10] Hyundai and ABB disagree about which standard of review applies to Commerce's decision to cancel verification.  Hyundai argues that it is a factual determination reviewed for substantial evidence, *see* Hyundai's Reply at 2–3, and the Government agrees, *see* Oral Arg. at 1:53:15–1:53:25 (time stamp from the recording).  ABB argues that Commerce's decision is reviewed for abuse of discretion.  ABB's Resp. at 17–18.
     Commerce's decision was based on the agency's factual finding that the information was so incomplete that it could not be verified.  I&D Mem. at 23.  Such determinations are reviewed for substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i); *see also JTEKT Corp. v. United States*, 33 CIT 1797, 1849–50, 675 F. Supp. 2d 1206, 1252 (2009) (explaining that a decision that information is unverifiable is "analyzed as a question of substantial evidence").

]].[11]  *See* DQR at 27–29.

Commerce and Hyundai thus agreed that Hyundai's normal books and records did not

reflect the actual costs associated with producing particular LPTs.  I&D Mem. at 8–9;

*see also* 19 U.S.C. § 1677b(f)(1)(A) (providing that the agency will generally rely on

normal books and records to calculate costs if, among other things, the records

"reasonably reflect the costs associated with the production and sale of the

merchandise").

Commerce further determined that Hyundai's initial questionnaire response was

deficient because it "failed to fully distinguish each quantity and value difference

between its SAP© costs and the costs reported to Commerce by cost type."  I&D Mem.

at 10.  Commerce issued a supplemental questionnaire to permit Hyundai to remedy

these deficiencies.  *See generally* 1st Suppl. Questionnaire.

---

[11] Hyundai explained that it keeps [[                                    ]] within its material
control system (referred to as "[[          ]]").  DQR at 27–28; *see also* Business
Proprietary Information on Cost Production and Constructed Value for the Final Results
(Apr. 12, 2019) ("COP/CV Mem.") at 6 & n.33, CR 939, PR 414, CJA Tab 20.  [[
        ]], referred to as the [[                              ]], "[[
                            ]]."  DQR at 28.  This [[                      ]]
was not used to [[                                                    ]]."  *Id.* The
other [[
      ]].  *Id.*  The [[
          ]].  *Id.*  Throughout the production process, Hyundai recorded materials
consumed in producing an LPT [[
                                                ]].  *Id.*  If the total cost
of materials consumed in producing an LPT [[

                                ]].  *Id.*  The [[          ]] costs were recorded in
the [[                        ]] but not the [[                  ]].  *Id.*

In the first supplemental questionnaire, Commerce requested that Hyundai provide, "[f]or each reported home market and U.S. sale, [] the total cost recorded in SAP, the total cost reported to the [agency], and an itemization of the materials and related costs making up the difference."  1SDQR at 8.  Commerce also instructed Hyundai to explain how it was able to "identify and quantify the costs that were mis[]-recorded in [the] SAP system," and to "show how the adjustments in each project offset each other and reconcile in total."  *Id.*  In response, Hyundai submitted a "schedule of direct materials" showing three years of material costs, broken down by month, for all LPTs.  I&D Mem. at 10; *see also* 1SDQR, Attach. SD-16.  Hyundai also provided a table, for a single sample month, outside the POR, showing the differences between each project's SAP bills of materials and actual bills of materials,[12] "but not the differences between [the] SAP© and the reported costs."  I&D Mem. at 10.[13]

In the second supplemental questionnaire, Commerce "listed the deficiencies in Hyundai's previous submissions and detailed the information that was necessary to rectify these deficiencies."  *Id.*  Commerce instructed Hyundai that, "[f]or each reported home market and U.S. sale," it must "provide the following in a [] schedule":

a. Total POR costs recorded in SAP and the total POR costs reported to [Commerce].  Ensure the total POR cost reported to [Commerce] agrees [with Hyundai's cost of production] file.

---

[12] Hyundai uses the terms "EEMTOS bills of materials" and "actual bills of materials" interchangeably.  *See* 1SDQR at 8.  For consistency, the court refers to this bill of materials as the "actual bill of materials."

[13] The actual bill of materials is one of several modules used in Hyundai's cost-accounting system to trace costs, *see* DQR at 18, which Hyundai used to [[
                                                          ]]; but Hyundai's per-unit costs of production were not based solely on the actual bill of materials, DQR at 27 ([[
                                                                              ]]).

> b. For the difference between the SAP costs and the reported costs . . .
> itemize each specific material and conversion cost item which make up
> that difference.  For example, identify all parts and raw materials that are
> included or excluded from other LPTs.
>
> c. For all SAP and reported cost itemized material and [conversion] cost
> differences, show which LPT project the itemized items were shifted to /
> from in SAP.
>
> d. Explain in detail how [Hyundai was] able to identify and [quantify] the
> costs which were mis[]-recorded in SAP.

2nd Suppl. Questionnaire at 3.

Hyundai partially complied by providing, in its response to subpart (b), a

worksheet which split the total cost differences by LPT project into the following

categories:

> 1) silicon steel costs;[14]
> 2) other material costs;
> 3) scrap;
> 4) fixed overhead costs;
> 5) material costs incurred after the year of cost of goods sold
> recognition on the project; and,
> 6) expenses recorded after the year of cost of goods sold
> recognition for the project.

I&D Mem. at 11.  For the *Final Results*, Commerce found that Hyundai provided

adequate cost information for only one of those six categories: other material costs.  *Id.*

at 11.

With respect to silicon steel, Hyundai explained that it "is a significant input into

LPT production" and is used to produce the core(s) within an LPT.  COP/CV Mem. at 9.

---

14 The parties use the terms silicon steel and core steel interchangeably.  *See, e.g.*, I&D
Mem. at 11.  For consistency, the court refers to the input as silicon steel.

Hyundai recorded the consumption of silicon steel "differently than other materials."

Hyundai's Mem. at 30 (citing DQR at 28).  Hyundai reported its consumption and per-

unit values for silicon steel by providing Commerce with: (1) silicon steel processing

reports providing the amount of silicon steel "consumed" in producing the required

amount of "cut core steel," 1SDQR at 9–10; and (2) engineering documents providing

"the theoretical [amount of] silicon steel necessary to achieve the desired electrical

properties" for a transformer, COP/CV Mem. at 10.  Hyundai stated that the difference

between the two figures was "yield loss."  1SDQR at 10.  While Hyundai also stated that

its SAP system records raw material purchases for each transformer, it went on to state,

with respect to silicon steel, that "there can be differences between" the purchased

amount and the consumed amount due to various factors, including differences in the

planned and actual yield loss.  *Id*. at 9.

Commerce concluded that Hyundai failed to report reliable silicon steel

consumption or explain the per-unit values reported for silicon steel on a project-specific

basis because of the unexplained differences between the SAP bill of materials,

engineering documents, and silicon steel processing reports.  I&D Mem. at 11.

Commerce found that Hyundai failed to explain how the silicon steel processing reports

reconcile to its SAP system[15] or explain the quantity differences reported in the SAP bill

of materials and the engineering documents.  *Id*. at 12.  Commerce explained that the

engineering documents did not corroborate the reported silicon steel consumption

---

[15] Commerce noted that the silicon steel costs can account for anywhere between [[
        ]] percent of the total cost difference for an LPT project.  COP/CV Mem. at 10 &
n.46 (citing 2SDQR, Attach. 2SD-1 at ECF p. 422).

because Hyundai "simply attributed the difference in quantities between the silicon steel

processing report and the engineering calculations to yield losses, and did not support

the quantities and values as requested in the question."  COP/CV Mem. at 10.

Commerce further found that "Hyundai did not explain how the silicon steel processing

reports then reconcile to its SAP system (i.e., normal books and records) and did not

explain the quantity differences between the SAP [bills of materials] and the theoretical

calculations."  *Id*.  Commerce concluded that it could not determine whether the

"project-specific input quantities and per-unit values" reported to Commerce were

supported by Hyundai's financial records.  *Id*.

    With respect to the fifth and sixth categories of costs (material costs incurred

after the year of cost of goods sold recognition for the project and expenses recorded

after the year of cost of goods sold recognition for the project), Hyundai provided the

aggregate "add back" of expenses and material costs incurred after the year of cost of

goods sold recognition for each project.  2SDQR, Attach. 2SD-1 at ECF p. 422.

However, Commerce found that Hyundai did not indicate the specific LPT projects these

expenses and material costs were shifted to or from or itemize the specific expenses or

materials that were shifted.  *See* I&D Mem. at 12.  With respect to fixed overhead and

scrap (the third and fourth categories of costs), Hyundai provided the total "recalculated"

amounts for each LPT project.  *See* 2SDQR, Attach. 2SD-1 at ECF p. 422.

    Thus, Commerce concluded that Hyundai's product-specific cost information was

not reliable because Hyundai failed to demonstrate the impact of its cost shifting or

reverse its effects.  I&D Mem. at 13.

**2. Substantial Evidence Supports Commerce's Determination that Hyundai Failed to Report Reliable Silicon Steel Costs and Consumption**

Hyundai argues that its reported cost information for silicon steel satisfied the agency's information requests.  *See* Hyundai's Mem. at 30–34.  Hyundai acknowledges that it could not track the "shifting of silicon steel costs from one project to another," *id*. at 31, but claims it provided the agency with the only documents it possessed regarding silicon steel consumption: the silicon steel processing report and engineering documents, *id*. at 32–33.

The Government asserts that Commerce correctly found that the engineering documents do not contain the actual material consumption for silicon steel because they provide only a theoretical calculation of the amount of silicon steel "necessary to achieve the desired electrical properties."  Gov't's Resp. at 15; *see also* ABB's Resp. at 11–12.  The Government further avers that Hyundai conceded that it does not track actual silicon steel consumption on a project-basis, indicating that such information would not have been obtainable even if Commerce had conducted verification.  Gov't's Resp. at 20.

Hyundai's arguments are not persuasive.  Hyundai's contention that it provided the agency with the only documents it had regarding silicon steel consumption does not mean that those documents satisfied the agency's information requests.  Commerce considered Hyundai's reported documents and reasonably determined that they did not adequately respond to Commerce's information requests.  While Hyundai has referred to three sets of figures associated with silicon steel used in each LPT project, Hyundai has failed to explain how any of those figures, or the differences between those figures,

reliably represent the amount of silicon steel actually contained and consumed in the production of a given LPT.

Hyundai challenges Commerce's determination that the differences between the amounts reported in the silicon steel processing reports and the engineering documents are not attributable to yield losses.  Hyundai's Mem. at 33.  Commerce explained that "[y]ield losses are typically based on the difference between the consumption for the job and the actual amount in the final product."  COP/CV Mem. at 10.  The asserted yield losses, however, were based on the differences between the "theoretical [quantities] necessary to achieve the desired electrical properties" and the amount consumed at a "preliminary processing stage."  COP/CV Mem. at 10; *see also* 1SDQR at 9–10. Hyundai also did not reconcile its silicon steel processing reports to its SAP system (i.e., its normal books and records).  COP/CV Mem. at 10.  Hyundai has failed to establish that Commerce did not consider certain evidence nor did Hyundai identify an error in Commerce's analysis of Hyundai's yield-loss argument.

The court also is not persuaded by Hyundai's argument that it is being faulted for failing to provide a reconciliation that was never requested.  *See* Hyundai's Mem. at 33– 34.  Commerce instructed Hyundai to provide a schedule that itemized costs for each home market and U.S. sale and to "[e]xplain in detail how [Hyundai was] able to identify and [quantify] the costs which were mis[]-recorded in SAP."  2nd Suppl. Questionnaire at 3.  This request sufficiently communicated to Hyundai that it was to explain and provide documentation supporting the differences in the amount of silicon steel consumed and the per-unit values as reported in the silicon steel reports, engineering

documents, and SAP bills of materials.  Hyundai, as the party that adopted a system of

recording costs that shifted them across projects, bore the burden of establishing that it

was able to reconcile the information contained in such a system with accurate, product-

specific costs reported to Commerce and that, at the aggregate level, all costs

associated with subject LPTs were reported.  *Cf. QVD Food Co. v. United States*, 658

F.3d 1318, 1324 (Fed. Cir. 2011) (stating that the respondent has "the burden of

creating an adequate record").

For these reasons, the court finds that substantial evidence supports

Commerce's determination that Hyundai failed to report reliable costs for its silicon steel

consumption.

**3.   Substantial Evidence Supports Commerce's Determination that Hyundai Failed to Reliably Report Other Categories of Product-Specific Costs**

Because silicon steel is a significant input into LPT production, Hyundai's failure

to report reliable costs for that input might have been sufficient to support Commerce's

determination to disregard Hyundai's cost reporting; however, Commerce also found

that Hyundai failed to provide reliable cost information with respect to four other cost

categories (i.e., scrap; fixed overhead costs; material costs incurred after the year of

cost of goods sold recognition for the project; and expenses recorded after the year of

cost of goods sold recognition for the project).  I&D Mem. at 11.  Hyundai challenges

these additional findings.

Commerce found that with respect to the latter two categories, Hyundai did not

indicate the specific LPT projects these expenses and material costs were shifted to or

from or itemize the specific expenses or materials that were shifted.  *See id*. at 12.  At

oral argument, Hyundai contended that it provided a worksheet reporting, on a project-specific basis, the costs that were shifted for each category.  Oral Arg. at 29:55–31:20 (discussing the "Details of Adjustment" worksheet, 2SDQR, Attach. 2SD-1 at ECF p. 422).  The Government noted that this worksheet represents a "sample" of projects.  *Id.* at 41:40–42:05.  Commerce did not request a sample of projects; rather, the agency instructed Hyundai to provide a breakdown of each category of costs for *each U.S. and home market sale*.  *Id.* at 52:20–53:25; *see also* 2nd Suppl. Questionnaire at 3.  Thus, substantial evidence supports Commerce's finding that Hyundai did not provide the detailed information to support its cost shifting with respect to "add back" of expenses and material costs.

Similarly, for fixed overhead and scrap, Hyundai provided the total "recalculated" amounts for each LPT project, but these amounts do not explain how Hyundai identified and quantified these costs in the SAP system or identify the LPTs between which these costs were shifted.  *See* 2SDQR, Attach. 2SD-1 at ECF p. 422.  Thus, substantial evidence supports Commerce conclusion that Hyundai did not provide adequate responses with respect to these categories of costs.[16]

---

[16] ABB and Hyundai dispute whether Commerce found that Hyundai's reporting of copper wire consumption provided an additional basis to apply total AFA.  *See* ABB's Resp. at 6–7; Hyundai's Reply at 17–18.  While Commerce stated that Hyundai reported "contradictory statements about copper wire," such that the agency had concerns "as to the accuracy and appropriateness of [Hyundai's] reporting," COP/CV Mem. at 11–12, Commerce did not state that Hyundai's reporting of copper wire rendered Hyundai's cost information unreliable and the court does not rely on any deficiencies with respect to copper wire reporting as a basis for its holding.

### B. Cost-Reconciliation Information

#### 1. Additional Background

Commerce determined that Hyundai was not able to reconcile its aggregate reported costs of production to its financial statements. I&D Mem. at 16. Commerce recognized that the complex nature and extended production time for LPTs required reporting costs beyond the normal 12-month POR and Commerce accepted Hyundai's adaptation of its "overall cost reconciliation to incorporate these pre- and post-POR costs." *Id*. at 14–15. However, Commerce determined that Hyundai did not provide adequate responses detailing data for each category of merchandise not under consideration in its cost reconciliation for cost of manufacturing. *See id*. at 15.

In the Initial Section D Questionnaire, Commerce requested that Hyundai "illustrate how the costs reported on the financial statement reconcile to the general ledger or trial balance, to the cost accounting system (i.e., the source used to derive the reported costs), and to the reported costs." Initial Questionnaire at D-12 (emphasis omitted). Commerce provided a worksheet for Hyundai to use in reporting this information. *Id*. at D-14.

Hyundai responded by providing a worksheet that purported to reconcile the cost of sales for fiscal years 2016 and 2017 with the aggregate production costs reported to Commerce. DQR, Attach. D-20, ECF p. 144, "Cost Reconciliation - WS 2" (hereinafter referred to as "Worksheet WS2"). Hyundai identified nine categories (or classifications) of costs, and for each category, distinguished between costs associated with "Order[s]

including Subject Merchandise" and costs associated with "Non-subject Merchandise."[17]

*Id*.  However, this worksheet and Hyundai's other reported cost-reconciliation

information were not formatted in accordance with the worksheet Commerce provided.

*Compare* DQR, Attach. D-20 at ECF pp. 136, 143–45, *with* Initial Questionnaire at D-14.

Commerce found that this response was inadequate.  *See* I&D Mem. at 15.

Commerce issued a supplemental questionnaire instructing Hyundai to use the format

of the worksheet Commerce provided and to "[d]iscuss how [Hyundai] separated cost of

sales on [Worksheet] WS2 between [merchandise under consideration] and

[merchandise not under consideration]."  1st Suppl. Questionnaire at 6.  Commerce

further instructed Hyundai to "[d]emonstrate and provide supporting documentation for"

its breakout of merchandise under consideration and merchandise not under

consideration "for transformers."  *Id*.

In response to the supplemental questionnaire, Hyundai reported the same costs

for the category "[merchandise not under consideration] from Transformer" that it

reported for that category in response to the initial questionnaire.  1SDQR, Attach. SD-

23.  Similarly, Hyundai reported the same values for the other categories of costs

reported in Worksheet WS2.  *Compare id*., *with* DQR, Attach. D-20 (Worksheet WS2).

---

[17] Costs associated with non-subject merchandise include costs of producing and selling LPTs in fiscal years 2016 and 2017 when the LPT does not qualify as subject merchandise because, for example, it did not enter the United States during the POR or was sold to a third country.  *See* I&D Mem. at 15 (describing costs for "merchandise not subject to this review").

In its administrative case brief, Hyundai stated that the line item for costs associated with "[merchandise not under consideration] from Transformer" included the cost of manufacturing for: "1) non-subject merchandise; 2) third-country sales; 3) U.S. shipments that did not enter the United States during the POR; and, 4) home market shipments made outside the POR and window periods."[18]  I&D Mem. at 15 & n.60 (citing Hyundai's Case Br. at 20).[19]  However, Hyundai did not separately identify these reconciliation items in its questionnaire responses, and Commerce concluded that Hyundai failed to identify adequately and explain each reconciliation item.  *Id*. at 15–16. Commerce noted that its need for this reconciling data was particularly acute in this case because, as discussed *supra*, Hyundai's normal books and records did not accurately capture costs on a project-specific basis.  *See id*. at 4, 16.  Thus, for its *Final Results*, Commerce determined that Hyundai did not provide requested cost reconciliation data despite being "specifically required [to do so] two different times by Commerce."  *Id.* at 15.

**2. Commerce's Determination that Hyundai Failed to Report Reliable Cost-Reconciliation Information is Supported by Substantial Evidence**

Hyundai claims that Commerce's determination that Hyundai did not provide adequate cost-reconciliation information is unsupported by substantial evidence.

---

[18] The term "window periods" refers to home market sales made up to 90 days before or 60 days after the POR to which U.S. sales may be matched in accordance with 19 CFR § 351.414(f).  *See Fischer S.A. Comercio, Industria & Agricultura v. United States*, 36 CIT 1604, 1605, 885 F. Supp. 2d 1366, 1370 (2012).

[19] Page 20 of Hyundai's Case Brief was not included in the joint appendices but was separately filed by Hyundai.  *See* Ltr. from David E. Bond, White & Case, LLP, to the Court (June 9, 2020), Attach., ECF No. 54.

Hyundai's Mem. at 25–26.  Specifically, Hyundai advances two arguments: (1) Hyundai

broke out nine categories of merchandise not under consideration consistent with the

agency's information request; and (2) the agency did not instruct Hyundai to provide the

level of detail that it now faults Hyundai for failing to provide.  *Id*. at 26.

Hyundai's first argument lacks merit.  As discussed above, the first supplemental

questionnaire requested additional cost-reconciliation information and indicated that

Hyundai had failed to provide adequate information in its initial questionnaire response.

By merely reporting the same information in a different format, Hyundai did not address

the agency's concerns with the substance of Hyundai's cost-reconciliation information.

Moreover, the worksheet in question contained the line item "[merchandise not under

consideration] from Transformer" that Hyundai did not separately break out as

requested.  *See* I&D Mem. at 15.  Because Hyundai did not report "this basic

information," the agency could not "explor[e] further the reasonableness of the costs . . .

and was impeded from gathering additional data that confirms that no costs were

improperly excluded under the guise of 'merchandise not subject to this review.'"  *Id.* at

16.

Regarding Hyundai's second argument, Commerce expressly requested Hyundai

to explain how it separated merchandise under consideration from merchandise not

under consideration in its questionnaire response and, in particular, to demonstrate and

provide supporting documentation for the breakout related to transformers.  1st Suppl.

Questionnaire at 6.  Hyundai's general references to various reconciliation items

contained in the classification "[merchandise not under consideration] from Transformer"

demonstrates that Hyundai had some ability to report and understanding of the

information Commerce requested.  *See* Hyundai's Case Br. at 20.

### C. Commerce's Determinations to Cancel Verification and Rely on Total Facts Otherwise Available are Supported by Substantial Evidence and in Accordance with the Law

As discussed above, substantial evidence supports Commerce's determination

that Hyundai failed to provide requested cost information in response to the agency's

requests, both with respect to its product-specific costs and its cost-reconciliation

information.  Because substantial evidence supports these findings, the court finds that

substantial evidence supports Commerce's determination that Hyundai's cost

information was so incomplete as to be unverifiable. [20]  *See* I&D Mem. at 18 ("The

missing explanations, information, and full disclosure in its reconciliation would have

formed, in part, the objective of the verification itself and, thus missing from the record,

rendered verification meaningless."); *cf. Hyundai Steel Co. v. United States*, 42 CIT ___,

___, 282 F. Supp. 3d 1332, 1350 (2018) (explaining that the crux of an unverifiability

determination is whether "Commerce, upon reviewing the submission in question,

---

[20] Hyundai contends that Commerce's cancellation of verification is undermined by the agency's decision to conduct verification of similar information in the original investigation and the second administrative review.  Hyundai's Mem. at 21–23 (referencing Evidence to Rebut, Clarify, or Correct Information in ABB's June 29, 2018 Cmts. on Hyundai's Suppl. Sec. D Questionnaire Response (July 10, 2018), Exs. 1 & 2, CR 689, PR 247 CJA Tab 8).  Commerce provided a reasoned explanation for finding Hyundai's cost information unreliable and unverifiable in this administrative review.  *See* I&D Mem. at 12–13.  Particularly with regard to record-based factual findings, each administrative review is a separate exercise of Commerce's authority and allows for different conclusions based on different facts in the record.  *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2014).  Thus, Commerce was not obligated to attempt to verify Hyundai's information in this review simply because it had conducted verifications in prior segments of the proceeding.

cannot discern which data is meant to be tested").[21]  Again, as is the case here,

Commerce is not obligated to consider information that is "so incomplete that it cannot

serve as a reliable basis for reaching the applicable determination."  19 U.S.C.

§ 1677m(e)(3); *see also Papierfabrik*, 843 F.3d at 1382–83.  Without reliable cost

information to determine Hyundai's cost of production, substantial evidence supports

Commerce's reliance on total facts otherwise available.[22]

### III.   Commerce's Use of an Adverse Inference is Supported by Substantial Evidence

Commerce determined that Hyundai's conduct in this case warranted an adverse

inference because Hyundai did not satisfy the "best of its ability" standard when it failed

---

[21] Hyundai argues that Commerce was required to identify inconsistencies in Hyundai's cost information to find it unverifiable.  Hyundai's Mem. at 19–20.  In *Hyundai Steel,* the court found that "Commerce's cited grounds for unverifiability *included* 'inconsistencies, and . . .  multiple unexplained, or insufficiently explained, changes' in Hyundai's data." *Hyundai Steel*, 282 F. Supp. 3d at 1350 (alteration in original) (emphasis added) (citation omitted).  While such inconsistencies were sufficient in that case, the court did not find, as a legal matter, that Commerce must identify such inconsistencies in order not to conduct a verification.  Congress "left it to Commerce to decide what [] factual circumstances" may permit a finding that information is unverifiable.  *JTEKT Corp.*, 33 CIT at 1850, 675 F. Supp. 2d at 1252.

[22] Hyundai argues that, if Commerce had conducted verification, Hyundai could have provided information at verification to support its cost reporting.  *See* Hyundai's Mem. at 23–24.  However, Commerce considered the amount of information required to conduct verification and determined that "[v]erification is not an appropriate forum in which to collect significant amounts of new explanation and information."  I&D Mem. at 13.  The purpose of verification is to "verify the accuracy and completeness of *submitted* factual information," 19 C.F.R. § 351.307(d) (emphasis added), not collect new information, *Marsan Gida Sanayi v. Ticaret A.S.*, 37 CIT ___, ___, 931 F. Supp. 2d 1258, 1280 (2013), *as amended* (Aug. 6, 2013).  Substantial evidence supports Commerce's finding that Hyundai failed to provide cost-reconciliation information requested by Commerce and the court will not second guess Commerce's assessment that the limited information received provided an insufficient basis to conduct a verification.  *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015) (explaining that the court does not reweigh the evidence).

to provide basic information that "any company should be expected to be able to

provide" despite multiple requests.  I&D Mem. at 23.  Hyundai argues that Commerce's

use of an adverse inference is not supported by substantial evidence.  Hyundai's Mem.

at 34–37.  As discussed more fully below, Hyundai's arguments lack merit.

Hyundai argues that the agency did not make a finding that Hyundai failed to act

to the best of its ability to report cost-reconciliation information.  Hyundai's Mem. at 35–

36.  However, Commerce explained that it required both cost-reconciliation information

and product-specific information to accurately determine Hyundai's cost of production.

*See* I&D Mem. at 20–21.  Thus, contrary to Hyundai's argument, Commerce's finding

that "Hyundai failed to provide the basic information necessary to perform the dumping

calculations . . . and to substantiate what the actual costs were for its transformers," *id.*

at 23, applies to Hyundai's reported cost information *as a whole*.  Further, as discussed

*supra*, substantial evidence supports Commerce's conclusion that the cost-

reconciliation information that Hyundai provided "did not reflect a legitimate attempt to

provide Commerce with a 'full and complete' demonstration" that its reported costs of

production were accurate.  *NSK Ltd. v. United States*, 481 F.3d 1355, 1361 (Fed. Cir.

2007).

Hyundai claims that Commerce's finding that Hyundai did not "act to the best of

its ability" does not "take into account the actual limitations of Hyundai's cost accounting

system."  Hyundai's Mem. at 37.  The only accounting "limitations" Hyundai identifies

are those associated with its cost shifting (i.e., that Hyundai does not record actual

expenses associated with producing LPTs on a project-specific basis).  *See id*. at 36–

37.  While Hyundai claimed to have reversed the effects of its cost shifting, it did not substantiate those claims before Commerce.  *See* I&D Mem. at 4 (finding that Hyundai did not "demonstrate how the manipulation of its normal records was reversed").  At the cost-reconciliation level, Hyundai did not break-down the categories of adjustments as Commerce requested so that Commerce could verify that any costs shifted away from subject merchandise were recaptured in Hyundai's reporting methodology.  *Id*. at 16 (Commerce could not determine whether "costs were improperly excluded under the guise of 'merchandise not subject to this review'").  Similarly, at the project- and product-specific levels, Hyundai failed to detail each cost adjustment made, denying Commerce another avenue to confirm that all costs associated with subject merchandise had properly been recaptured.  *See id.* at 21 (explaining that Commerce requires "[t]he itemization of cost differences and tracing of those differences to each project").  Such detailed information had to be available to Hyundai if it had accurately recaptured all costs—and indeed, in limited instances, Hyundai provided discrete samples detailing the adjustments for short periods of time and for limited categories of expenses, *see* 1SDQR, Attach. SD-16 at ECF pp. 223–28 (breaking down direct material costs for March 2016 by project number, as recorded in the SAP, the EEMTOS, and the difference between the two); 2SDQR, Attach. 2SD-1 at ECF p. 423 (capturing the costs of specific materials shifted between sampled projects for the category "other material costs")—confirming that Hyundai failed to act to the best of its ability to provide supporting documentation to Commerce, I&D Mem. at 23.

The Government and Hyundai dispute the applicability of *Tung Fong Industrial v. United States*, 28 CIT 459, 474, 318 F. Supp. 2d 1321, 1335 (2004), in which the court determined that a company run by one person could not be expected to provide the detailed information Commerce requested.  *See* Hyundai's Mem. at 37; Gov't's Resp. at 18; Hyundai's Reply at 20–21.  Citing *Tung Fong*, Hyundai argues that Commerce's application of AFA did not consider Hyundai's "ability to respond to certain requests." Hyundai's Mem. at 34; *see also* Hyundai's Reply at 20.  The Government argues that *Tung Fong* is inapplicable because the *Tung Fong* court cited the size of the company as a basis for finding that the agency could not have reasonably expected the respondent to be more forthcoming.  Gov't's Resp. at 18 (citing *Tung Fong*, 28 CIT at 477–78, 318 F. Supp. 2d at 1337).

Hyundai's reliance on *Tung Fong* is misplaced.  The respondent in *Tung Fong* represented that it was unable to comply with Commerce's information requests due to its small size and time constraints, and Commerce failed to address these circumstances in applying an adverse inference.  28 CIT at 475–76, 318 F. Supp. 2d at 1335–36.  By contrast, the only factor that Hyundai cites as preventing it from responding to Commerce's information requests is the limits of its own record keeping system.  *See* Hyundai's Mem. at 37.  Even if true, the "best of its ability" standard does not condone "inadequate record keeping."  *Nippon Steel*, 337 F.3d at 1382; *see also* I&D Mem. at 22–23 (finding that "affirmative evidence of bad faith" is not required to use an adverse inference and Hyundai failed to provide information that "any company should be expected to be able to provide").

For these reasons, the court sustains Commerce's use of an adverse inference.

### CONCLUSION

In accordance with the foregoing, Commerce's *Final Results* will be sustained.

Judgment will enter accordingly.

/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated: August 4, 2020
New York, New York